**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MONIQUE KATZ and YEKATERINA
SKIDANENKO, individually and on behalf of all
others similarly situated,

                    Plaintiffs,

      v.

EQUINOX HOLDINGS, INC.

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No.: 1:20-CV-09856 (VEC)

**FIRST AMENDED COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

       Plaintiffs MONIQUE KATZ ("Katz") and YEKATERINA SKIDANENKO ("Skidanenko") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this action for damages and other legal and equitable relief against Defendant EQUINOX HOLDINGS, INC. for violations of the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*; the New York Labor Law ("NYLL"); the New York Codes, Rules and Regulations ("NYCRR"); the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); the New York City Human Rights Law ("NYCHRL"); and any other cause(s) of action that can be inferred from the facts set forth herein.

## <u>INTRODUCTION</u>

      1.    This is a putative collective and class action brought by Plaintiffs challenging acts committed by Defendant against Plaintiffs and those similarly situated, which amount to violations of federal and state wage and hour laws.

      2.    Defendant owns and operates luxury fitness centers located across the state of New York and the United States.

      3.    On December 5, 2019, a New York Times article titled "Working at Equinox: It's Very Hunger Games," proffers that Joe Matarazzo, an Equinox Vice President, stated Defendant

"never requires trainers to put in unpaid overtime: Trainers' per session rates are meant to cover additional time spent preparing for workouts with clients. . . . In most cases, they're not working 15 to 20 hours only. . . . They have opportunities."

4. Throughout the years, however, Defendant has been the subject of several wage-and-hour lawsuits across the country that allege, among other things, Defendant failed to pay its employees statutorily required overtime compensation. *See Fodera, Jr. v. Equinox Holdings, Inc.*, 3:19-CV-05072 (N.D. Cal. 2019); *Rosales v. Equinox Holdings Inc*., No. 3:18-CV-00356 (N.D. Tex. 2018); *Kenon v. Equinox Holdings, Inc., et al.*, No. 1:16-CV-07869 (S.D.N.Y. 2016); *Letta v. Equinox Holdings, Inc.*, Case No. 1:12-CV-00789 (S.D.N.Y. 2012); *Leigh v. Equinox Holdings Inc.*, No. BC 463577, (Cal. Sup. Court L.A. Cnty. 2011).

5. Defendant employed Plaintiffs and all other persons similarly situated as Personal Trainers who provided physical training sessions and other services to Defendant's members. Defendant employed the Personal Trainers in various tiers titled: "Tier 1," "Tier 2," "Tier 3," "Tier 3+," and "Tier X."

6. Plaintiffs are both similarly situated to Tier 1 and Tier 2 Trainers because Plaintiff Katz was employed as a Tier 1 and Tier 2 Trainer (collectively, "Low-Tier Trainers") from in or around August 2015 to in or around August 2016, and Plaintiff Skidanenko was employed as a Tier 1 Trainer from in or around July 2019 to in or around January 2020. Plaintiff Katz is similarly situated to Tier 3 and Tier 3+, and Tier X Trainers (collectively, "High-Tier Trainers") (together with Low-Tier Trainers, "Trainers") because from August 2016 to March 2020 she was employed as a Tier 3 Trainer, which had the same primary job duty as Tier 3+ and Tier X Trainers of performing personal training sessions for Defendant's members, and because she was paid in the same manner as these Tiers.

7.     Trainers' designated Tiers were dependent upon their experience and tenure with Defendant. While all Trainers were paid in a similar manner, they were paid different rates relative to their Tier levels and had different primary job duties depending on whether they were Low-Tier Trainers or High-Tier Trainers.

8.     In addition to several other wage and hour violations, Defendant paid the Trainers on a per personal training session basis (*i.e.*, a flat fixed rate) that did not adequately account for hours worked and the overtime due to them in accordance with the law.

9.     Moreover, Defendant's pay policy in general outright fails to include an overtime premium for all hours worked in excess of forty (40) hours per workweek.

10.     Thus, pursuant to 29 U.S.C. § 216(b), Plaintiff Katz brings this action on behalf of herself and a collective of persons who are/were employed by Defendant as Tier 3, Tier 3+, and Tier X Trainers within the State of New York from May 13, 2018, through the final date of the disposition of this action who were not paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek and are entitled to recover: (i) unpaid and incorrectly paid wages; (ii) unpaid overtime wages; (iii) liquidated damages; (iv) interest; (v) attorneys' fees and costs; and (vii) such other and further relief as this Court finds necessary and proper.

11.     Plaintiff Katz additionally bring this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and a class of persons who are/were employed by Defendant as Tier 3, Tier 3+, and Tier X Trainers within the State of New York from November 23, 2014, through the final date of the disposition of this action who were: (i) not paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) not paid all of their earned and due wages on their regularly scheduled paydays/had their wages unlawfully

deducted; (iii) not paid on a weekly basis; and/or (iv) not issued the proper wage statements pursuant to the NYLL, which violates the NYLL and the NYCRR and are entitled to recover: (i) unpaid overtime wages; (ii) unpaid and incorrectly paid wages; (iii) liquidated damages; (iv) penalties; (v) interest; (vi) attorneys' fees and costs; and (vii) such other and further relief as this Court finds necessary and proper.

12.     Further, pursuant to 29 U.S.C. § 216(b), Plaintiff Skidanenko brings this action on behalf of herself and a collective of persons who are/were employed by Defendant as Tier 1 and Tier 2 Trainers within the State of New York from December 3, 2018, through the final date of the disposition of this action who were not paid: (i) the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; and/or (ii) not paid the federal minimum wage for all hours worked per workweek and are entitled to recover: (i) unpaid and incorrectly paid wages; (ii) unpaid overtime wages; (iii) unpaid minimum wages; (iv) liquidated damages; (v) interest; (vi) attorneys' fees and costs; and (vii) such other and further relief as this Court finds necessary and proper.

13.     Plaintiffs also bring this action together pursuant to Fed. R. Civ. P. 23, on behalf of themselves and a class of persons employed by Defendant as Tier 1 and Tier 2 Trainers within the State of New York from March 25, 2014, through the final date of the disposition of this action who were: (i) not paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) not paid New York State's minimum wage for all hours worked per week; (iii) not paid all of their earned and due wages on their regularly scheduled paydays/had their wages unlawfully deducted; (iv) not paid on a weekly basis; (v) not paid "spread of hours" pay for each day worked in excess of ten (10) hours; and/or (iv) not issued the proper wage statements pursuant to the NYLL, which violates the NYLL and the

NYCRR and are entitled to recover: (i) unpaid overtime wages; (ii) unpaid minimum wages; (iii) unpaid "spread of hours" pay; (iii) unpaid and incorrectly paid wages; (iv) liquidated damages; (vi) penalties; (vii) interest; (viii) attorneys' fees and costs; and (ix) such other and further relief as this Court finds necessary and proper.

14.     Lastly, Plaintiff Katz individually brings this action pursuant to the FMLA for retaliation and leave interference and the NYCHRL for sexual harassment, discrimination, and retaliation and is entitled to recover (i) back pay; (ii) front pay; (iii) emotional distress damages; (iv) punitive damages; (v) liquidated damages; (vi) interest; (vii) attorneys' fees and costs; and (viii) such other and further relief as this Court finds necessary and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States.

16.     Jurisdiction is also proper under 28 U.S.C. § 1332(d) as each of the Fed. R. Civ. P. 23 classes alleged herein is comprised of over one hundred (100) members and have damages in excess of $5,000,000.00, exclusive of interest and costs. There is also one class member from each class who is a citizen of and resides in a state other than New York or Delaware.

17.     Venue is proper in this Court pursuant to 29 U.S.C. §§ 201 *et seq*., in as much as this judicial district lies in a State in which the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendant maintains facilities, conducts business, and resides in this district.

18.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article

III of the United States Constitution.

**THE PARTIES**

19.     At all relevant times, Plaintiff Katz was an "employee" within the meaning of the FLSA, the NYLL, the NYCRR, the FMLA, and the NYCHRL. Plaintiff Katz resides in Brooklyn, New York.

20.     Upon information and belief, Plaintiff Katz worked at least one thousand two hundred and fifty (1,250) hours for Defendant within the twelve (12) months immediately preceding Plaintiff Katz's requests for FMLA leave alleged herein.

21.     At all relevant times, Plaintiff Skidanenko was an "employee" within the meaning of the FLSA, the NYLL, and the NYCRR. Plaintiff Skidanenko resides in Brooklyn, New York.

22.     Upon information and belief, Defendant is a privately owned corporation organized under the laws of the State of Delaware. Defendant's corporate headquarters are located at 895 Broadway, Manhattan, New York 10003.

23.     Defendant transacted and continues to transact business in New York and within New York County by employing Plaintiff Katz and all those similarly situated as Trainers.

24.     Defendant has at all relevant times been an "employer" covered by the FLSA, the NYLL, the NYCRR, the FMLA, and the NYCHRL.

25.     Upon information and belief, the amount of qualifying annual volume of business for Defendant exceeds $500,000.00 and thus subjects Defendant to the FLSA.

26.     Upon information and belief, Defendant is engaged in interstate commerce, independently subjecting Defendant to the FLSA.

27.     Upon information and belief, throughout the relevant time period, Defendant employed at least fifty (50) employees.

28.     Upon information and belief, throughout the relevant time period, Defendant employed at least fifty (50) employees at the worksite where Plaintiff Katz worked.

29.     Upon information and belief, throughout the relevant time period, Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of the worksite where Plaintiff Katz worked.

30.     At all relevant times, Defendant had knowledge that failing to pay the Trainers overtime for all hours worked in excess of forty (40) per workweek violates the FLSA, the NYLL, and the NYCRR.

31.     Defendant paid the Trainers from their corporate headquarters.

32.     Defendant formulated and issued the Trainers their employment policies.

33.     Defendant formulated the Trainers' employment policies, including but not limited to all pay policies.

34.     The Trainers were required to adhere to Defendant's employment policies and standards.

35.     The Trainers agreed to be employed by Defendant at one or more of its facilities.

36.     Defendant interviewed Plaintiff Katz.

37.     Defendant hired Plaintiff Katz and assigned Plaintiff Katz her worksite.

38.     Defendant had the power to hire and fire the Trainers.

39.     Defendant set the Trainers' rate of pay and their basis of pay.

40.     Defendant maintained the Trainers' employment records.

41.     Defendant disputed Plaintiff Katz's request for unemployment compensation.

42.     Defendant, through its agent Equifax, Inc., represented to the New York Department of Labor that Defendant was her employer.

43. Upon information and belief, Defendant provided Human Resources related services to its Trainers.

44. Defendant posts available Trainer positions on its website: www.equinox.com.

## STATEMENT OF FACTS

I. **General Facts**

45. Upon information and belief, Defendant owns and operates more than twenty (20) fitness centers throughout the State of New York.

46. Defendant provides, among other things, physical fitness-related services to its members, which includes personal training sessions.

47. Low-Tier Trainers were entry-level positions that performed primarily entry-level job duties such as floor shifts (defined below), whereas High-Tier Trainers were the experienced Trainers and almost exclusively performed personal training sessions for Defendant's members.

48. Trainers were paid on both a non-hourly and hourly basis.

49. All Trainers were paid on a bi-weekly basis either by check or direct deposit.

50. Trainers had five (5) job duties: (i) floor shifts; (ii) Equifit sessions; (iii) personal training ("PT") sessions; (iv) guided sessions; and (v) meetings.

51. At all relevant times, both Low-Tier and High-Tier Trainers were designated as non-exempt from the statutory provisions of the FLSA, the NYLL, and the NYCRR.

a. Floor Shifts

52. The Trainers' floor shift job duties entailed cleaning the workout machines, cleaning the workout sites and equipment, handing out towels, returning weights and equipment to their proper location, answering member questions, and, for members not engaged in PT sessions, assigning with and demonstrating workouts, as well as attempting to recruit members for

8

private personal training sessions.

53. Floor shifts are supposed to last exactly 3 hours.

54. Tier 1 Trainers were usually scheduled to work five (5) floor shifts (one (1) per day) per week.

55. Tier 2 Trainers were usually scheduled to work two (2) to four (4) floor shifts (1 per day) per week.

56. During floor shifts Trainers are required to wear a light gray shirt. The word "Train" is on the front of the shirt with Defendant's logo on the back of the shirt.

57. The light gray shirt signifies to the Defendant's customers that these trainers are available to be asked questions and advice.

58. For example, a Trainer working a floor shift may ask a member if they want a "spot" for a bench press or voluntarily offer a critique of a member's form and demonstrate proper form.

59. A Trainer clocks in to start their scheduled floor shift and clocks out at the end of their floor shift.

60. However, Low-Tier Trainers are strongly encouraged to be on the floor—in their light gray shirts — both before and after the scheduled floor shift and without clocking in.

61. Thus, even when Low-Tier Trainers are "off the clock" because they are on the floor and still in Defendant's uniform, they will continue to interact with customers and try to get business on behalf of Equinox along with the other floor duties they perform on behalf of Equinox.

62. Defendant's managers advise the Low-Tier Trainers to work on the floor in between paid work assignments when they are not officially "on the clock."

b. <u>Equifit Sessions</u>

63. Equifit sessions were conducted in two (2) phases.

64.     First, a Trainer conducting an Equifit session met with a member to assess their workout needs by performing tests such as heart rate, blood pressure, functional movement tests, and taking height and weight measurements.

65.     The Equifit assessment typically lasted between one (1) hour and an hour and fifteen (15) minutes.

66.     Second, the Trainer provided the member with a free one (1) hour PT session based upon the Equifit assessment.

67.     Prior to an Equifit training session, Trainers were required to prepare for the free Equifit training sessions by interacting with the member, cleaning the anticipated workout area, creating a workout plan, and gathering the requisite workout equipment.

68.     The Equifit training session preparation work usually took thirty (30) minutes to an hour to complete.

69.     During Equifit training sessions, Trainers provided the members with workout instructions, advice, and coaching.

70.     Following Equifit training sessions, Trainers were required to return the workout equipment to their proper locations and clean the area where they performed the training session.

71.     For each Equifit training session, the aforementioned post-Equifit training session work took approximately ten (10) to fifteen (15) minutes to complete.

72.     Trainers could perform between one (1) to five (5) Equifit sessions per workweek.

73.     Throughout the relevant time period, the Trainers were promised New York State's applicable minimum wage for all hours spent performing Equifit sessions.

74.     Defendant, however, did not compensate the Trainers New York State's minimum wage for all hours spent performing Equifit sessions. Nor did it include all Equifit sessions

performed on their paychecks.

75.     Upon information and belief, the purpose of the Equitfit sessions was to entice members to enroll in PT sessions.

76.     Defendant scheduled Trainers for Equifit sessions either by email or by including it on their schedule.

77.     The Trainers were not permitted to "clock-in" or "clock-out" of Defendant's computerized time recording system for Equifit sessions.

c.      Personal Training Sessions

78.     Throughout the relevant time period, the Trainers' PT sessions job duties entailed providing one (1) hour ("full session") or thirty (30) minute ("half session") PT sessions to Defendant's members who enrolled in PT sessions.

79.     Prior to each PT session, the Trainers were required to prepare for the PT sessions by creating and updating a PT session calendar, interacting with members, creating a workout program for the member on a spreadsheet, updating the member's workout plan, cleaning the anticipated workout area, and gathering the requisite workout equipment.

80.     For each PT session, the aforementioned preparation work took approximately thirty (30) minutes to an hour to complete and was typically completed in the same workweek as the PT session.

81.     During the PT session, the Trainers physically assisted Defendant's members with their workouts while providing workout plans, instructions, advice, and coaching.

82.     Each full PT session typically lasted between one (1) and one and a half (1½) hours.

83.     Each half PT session typically lasted between thirty (30) minutes to an hour.

84.     Following the PT session, the Trainers were required to return the workout

equipment to their proper locations and clean the area where they performed the training session.

85.     For each PT session, the aforementioned post-PT session work took between approximately ten (10) and fifteen (15) minutes to complete.[1]

86.     The Trainers could not perform PT sessions without performing the PT session activities.

87.     The PT session activities were an integral part of the Trainers' job duties and Defendant explicitly required it to be performed.

88.     Trainers are compensated on a fixed per PT session basis.

89.     This fixed rate of pay did not change based upon the type of workout provided to the member or the amount of time it took to perform the PT session activities.

90.     Trainers were paid half of their fixed PT session rate for half sessions.

91.     Pursuant to Defendant's fixed per PT session pay scheme, two (2) half sessions equated to a full session.

92.     It was common knowledge among the Trainers and Defendant's managerial staff (often former Trainers themselves) that Trainers performed well over two (2) to three (3) hours of PT session activities per week.

93.     Defendant had knowledge that the Trainers were performing PT session activities because it required them to do so.

94.     In practice, Defendant did not require or allow the Trainers to record all their time spent performing PT session activities.

95.     Defendant did not discipline the Trainers if they did not record all their time spent performing PT session activities.

---

[1] PT session preparation work and post-PT session work are hereinafter collectively referred to as "PT session activities."

96.     Defendant did not record all time spent by the Trainers performing PT session activities.

97.     Instead, Defendant either automatically included on the Trainers' paychecks that they performed two (2) hours to four (4) hours (depending upon the Tier level) of PT session activities per pay period (without paying any additional compensation for those hours) or it did not include the PT session activities time on their paychecks at all.

98.     Defendant's fixed per PT session pay basis was implemented company-wide.

99.     Trainers were paid their fixed per PT session pay only if the PT session was actually performed.

100.    Thus, Trainers had to perform an hour of work to earn their fixed per PT session pay.

101.    PT sessions were recorded via the Trainers' calendar, and Defendant paid the Trainers based upon the number of training sessions that were scheduled on their calendar.

102.    If a member canceled their PT session within twenty-four (24) hours of the scheduled session, the member was required to pay for that session.

103.    Defendant, however, highly encouraged Trainers to afford their members who canceled a PT session within twenty-four (24) hours of the PT session with a free "make-up" session during that same week or during a subsequent workweek.

104.    Upon information and belief, when a Trainer performed a "make-up" PT session in a subsequent workweek, it was not included in that week's pay.

d.      Guided Sessions

105.    Defendant provided non-members with free PT sessions called "guided sessions" to entice them to become members.

13

106.    The Trainers provided the guided session to the non-members.

107.    The Trainers were assigned guided sessions by Defendant's Membership Advisors either via email or by scheduling them on the Trainers' calendars

108.    Guided sessions typically lasted one (1) hour.

109.    To prepare for the guided session, the Trainers were required to interact with the non-member, clean the anticipated workout area, create a workout plan, and gather the requisite workout equipment.

110.    The guided session preparation work usually took approximately (30) minutes to complete.

111.    Following the guided session, the Trainers were required to return the workout equipment to their proper locations and clean the area where they performed the training session.

112.    For each guided session, the aforementioned post-guided session work took approximately ten (10) to fifteen (15) minutes to complete.

113.    Trainers were not permitted to record their actual time spent performing guided sessions.

114.    Upon information and belief, Defendant did not record the time spent by the Trainers performing guided sessions.

115.    The Trainers typically performed one (1) to five (5) guided sessions per workweek.

116.    Defendant did not compensate the Trainers anything for their time spent performing guided sessions.

e.      Meetings

117.    Defendant required Trainers to attend weekly update meetings that lasted approximately fifteen (15) minutes.

118.     The weekly update meetings were for the Trainers to meet with their Fitness and/or Personal Training Managers to discuss, among other things, member complaints, member PT session attendance, and PT programs.

119.     Defendant did not compensate Trainers anything for these weekly update meetings.

120.     Defendant also required Trainers to attend Equinox Fitness Training Institute ("EFTI") meetings when they became a Tier 1 Trainer and each time they ascended to a new Tier level.

121.     The EFTI meetings were either one (1) or (2) days per workweek for approximately eight (8) weeks.

122.     The EFTI meetings were designed to educate the Trainers on, among other things, nutrition, physical fitness programs, sales, and client retention.

123.     The EFTI meetings were typically conducted at a facility where the Trainers did not regularly work.

124.     Prior to the EFTI meeting, the Trainers were required to commute from their residence to the facility where they were assigned to work and then to the facility where the EFTI meeting was scheduled to take place.

125.     Following the EFTI meeting, they were required to commute from the facility where the EFTI meeting was conducted back to the facility where they were assigned to work.

126.     The Trainers were not compensated anything for their time spent commuting from one of Defendant's facilities to another.

127.     For example, during the relevant time period, Plaintiff Katz was required to attend EFTI meetings at Defendant's Tribeca facility, which was a twenty (20) minute walk from her assigned facility (Brookfield Place). Plaintiff Katz was not compensated anything for her time

spent walking from the Brookfield Place facility to the Tribeca facility and vice versa.

128. Similarly, during the relevant time period, Plaintiff Skidanenko was required to attend EFTI meetings at Defendant's Tribeca facility, which required a twenty (20) to thirty (30) minute-commute from her assigned facility in Brooklyn Heights. Plaintiff Skidanenko was not compensated anything for her time spent commuting from the Brooklyn Heights facility to the Tribeca facility and vice versa.

129. In addition, Plaintiff Skidanenko was also required to attend EFTI meetings at Defendant's Dumbo location, which required commuting from her assigned facility in Brooklyn Heights. Plaintiff Skidanenko was not compensated anything for her time spent commuting from Brooklyn Heights facility to Dumbo facility and vice versa.

130. The Trainers were also required to complete "homework," which was either a quiz or program design in conjunction with their EFTI meetings.

131. The EFTI homework usually took one (1) to two (2) hours to complete.

132. Defendant did not compensate the Trainers anything for the time spent completing the EFTI homework.

## II. Defendant's Violations of the FLSA, the NYLL, and the NYCRR

133. All of the Trainers' time spent attending weekly update meetings, commuting to and from EFTI meetings, completing EFTI homework, performing guided sessions, preparing for/concluding/making-up PT sessions, and performing Equifit sessions (collectively, the "Duties") were not factored into their hours worked per week.

134. All of the Trainers' time spent performing the Duties was compensable.

### a. Defendant's Failure to Pay Overtime and Defendant's knowledge of the violations

135. Defendant's written corporate policy that Plaintiffs and the Trainers were subjected

to did not include overtime pay for hours worked in excess of forty (40) hours per workweek.

136.    When including all the Trainers' time spent performing the Duties, the Trainers frequently worked above forty (40) hours per workweek.

137.    Throughout the relevant time period, however, Defendant failed to factor all of the Trainers' time spent performing the Duties into their hours worked per week. As a result of this failure, the Trainers were deprived of the statutorily required overtime premium of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek and, with respect to the Low-Tier Trainers, "spread of hours" pay for each day worked in excess of ten (10) hours.

138.    At all relevant times, Defendant had actual knowledge that the Duties brought the Trainers' weekly hours worked above or further above forty (40) hours per workweek.

139.    For example, Defendant's Executive Vice President, Joe Matarazzo's, statement to the New York Times is telling.

140.    Specifically, Mr. Matarazzo stated that Trainers worked much more than twenty (20) hours per week and that Defendant does not require Trainers to work unpaid overtime. Mr. Matarazzo stated that this was because the fixed per session flat rate is meant to cover all PT session activity work.

141.    Thus, Defendant knew that the PT session activity work brought the Trainers' weekly hours worked above or further above forty (40) hours per workweek.

142.    This statement by Mr. Matarazzo also evidences that Defendant knew that it did not compensate the Trainers one and a half (1½) their hourly rate for all hours worked in excess of forty (40) per workweek, as he states they were compensated pursuant to the fixed PT sessions flat rate policy for all hours worked during PT session activities.

143.    As for another example, on several occasions during the relevant time period, Plaintiff Katz informed her Personal Training Manager, Christopher Szefler ("Mr. Szefler"), that her PT session activities were taking thirty (30) or more minutes to complete per PT session.

144.    Mr. Szefler had knowledge of the amount of PT sessions Plaintiff Katz was performing each week because, upon information and belief, he reviewed her weekly PT session schedule (*i.e.*, the amount of personal training sessions she performed in a single week).

145.    Mr. Szefler also had knowledge of the amount of time Plaintiff Katz was spending on PT session activities because, upon information and belief, Mr. Szefler reviewed Plaintiff Katz's client's workout spreadsheets that she prepared and which included the time she spent preparing them.

146.    Plaintiff Katz has information and belief that Mr. Szefler reviewed her weekly PT session schedule and the time she spent preparing for a PT session because Defendant implemented a policy whereby Personal Training Managers, including Mr. Szefler, were required to review the High Tier Trainers', including Plaintiff Katz's, weekly PT session schedules and workout spreadsheets to verify that they conformed with Defendant's standards.

147.    Thus, Mr. Szefler had knowledge that Plaintiff Katz was working over forty (40) hours per week without overtime pay because he had knowledge that Plaintiff Katz was spending at least thirty (30) minutes on PT session activities per PT session based on her complaints to him and/or her clients' workout spreadsheets and because he knew how many PT sessions she was performing per week (*e.g.*, Mr. Szefler knew that Plaintiff Katz performed twenty-seven (27) or more PT sessions in a single week due to her PT session schedule and knew that it was for a total of forty and a half (40½) hours because of Plaintiff Katz's complaints).

148.    Mr. Szefler also had knowledge that Plaintiff Katz was not being paid overtime for

hours worked in excess of forty (40) because Defendant's corporate written policy does not provide for overtime pay to High Tier Trainers, including Plaintiff Katz.

149.    Additionally, Mr. Szelfer was previously employed by Defendant as a Trainer and thus knew from personal experience the substantial amount of time that High Tier Trainers had to spend on PT session activities.

150.    Similarly Plaintiff Skidanenko complained to her managers, John Jenkins and Emiliano Tramonotozzi about her erratic schedule and uncompensated hours, but as a result of her complaint, she was orally reprimanded for complaining instead.

151.    Furthermore, during one of Plaintiff' Skidanenko's performance reviews, Tramonotozzi instructed Plaintiff that to improve her performance, she should spend more unpaid time "on the floor" recruiting personal training clients (unpaid labor) and preparing for her personal training sessions (unpaid labor).

152.    At all relevant times, Defendant had actual or constructive knowledge that the Duties brought the Trainers, including Plaintiffs', weekly hours worked above or further above forty (40) hours of work per workweek.

153.    For example, although Defendant knew the Trainers, including Plaintiffs, were performing PT session activities and the amount of PT sessions they worked per workweek, it did not actually require or allow them to record their time performing said work.

154.    Similarly, even though Defendant knew that Low-Tier Trainers performed uncompensated floor shifts, it did not actually require or allow them to record their time performing such uncompensated work.

155.    As for another example, Defendant willfully recorded the incorrect number of PT session activities work on the Trainers', including Plaintiffs', paychecks each and every pay period

or not at all despite the varying numbers of PT sessions performed per workweek.

### b. Defendant's Minimum Wage Violations

156. Defendant stresses to Low-Tier Trainers the importance of "being out on the floor," "making contacts with potential clients" and, overall, using the floor as a mechanism to obtain new clients for training sessions.

157. Low-Tier Trainers have to login to an Equinox database through the Equinox website, where they can access their schedule, Equinox e-mail, training session plans and EFTI homework.

158. Low-Tier Trainers do not have control of the schedule of their floor shifts, EFTI or other team meetings.

159. This in turn results in Low-Tier Trainers essentially being forced to stay at their respective gym and work additional time on the floor beyond their scheduled floor shifts. For example, a one-hour team meeting may be at 10:00 a.m. and a floor shift beginning at 2:00 p.m. For at least a portion of the 11:00 a.m. to 2:00 p.m. the Low-Tier Trainer will—as encouraged by Defendant—use the "down time" to stay on the floor and try to recruit new personal training clients.

160. On information and belief, Defendant creates an erratic schedule of paid work to ensure that Low-Tier Trainers will remain on the premises, thereby effectively forcing them to remain on the floor working without pay.

161. As a resulting of being required to work uncompensated floor shifts, Low-Tier Trainers were not compensated the federal or New York State's minimum wage for all hours worked per week.

### c. Defendant's Failure to Timely Pay Wages, Unlawful Deduction of Wages, and Failure to Issue the Requisite Wage Statements

162. Defendant's compensation policy states that the Trainers were to be paid the applicable hourly minimum wage for all time worked on non-PT session activities, which includes the aforementioned mandatory meetings, Equifit sessions, commuting to and from EFTI meetings, and guided sessions (collectively, the "Hourly Rate Duties").

163. Defendant, however, did not compensate the Trainers the promised applicable minimum wage for all time spent performing the Hourly Rate Duties.

164. Defendant also did not issue the Trainers a wage statement with each paycheck reflecting their overtime rate or rates of pay, the accurate number of regular hours worked, the accurate number of overtime hours worked, and Defendant's telephone number.

### d. Defendant's Failure to Pay Trainers on a Weekly Basis

165. Defendant paid the Trainers on a bi-weekly basis and not on a weekly basis.

166. However, throughout the relevant time period, the Trainers spent 25% or more of their work time performing physical labor.

167. The entirety of a PT Session for Trainers consisted of physical labor, including physically moving weights and other equipment, demonstrating workouts, cleaning equipment and areas of Defendant's facility, continuously standing, and spotting individuals who were lifting weights or otherwise assisting members with their workout.

168. In addition, Trainers' duties during floor shifts consisted almost entirely of physical labor, including cleaning, handing out towels, physically moving weights and other equipment, physically assisting members with workouts, and demonstrating exercises to members.

169. High-Tier Trainers spent more than 25% of their work hours providing PT Sessions. In addition, many of their other job duties, such as floor shifts, physically setting up for and

cleaning up after PT Sessions, and providing Equifit and guided sessions, also consisted of physical labor, as described above.

170.    Low-Tier Trainers spent most of their work time performing floor shifts, and they also provided PT Sessions and Equifit sessions.  As described above, all of these roles consisted almost entirely of performing physical labor.

171.    Thus, all Trainers, including Plaintiffs, spent at least 25% of their work time performing physical labor,

**III.    Facts Specific to Plaintiff Katz**

172.    In August 2015, Plaintiff Katz began her employment for Defendant as a Tier 1 Trainer at its Brookfield Place, Manhattan, New York facility.

173.    Throughout her employment for Defendant, Plaintiff Katz worked at Defendant's Brookfield Place facility.

174.    In or around January 2016, Plaintiff Katz was promoted to a Tier 2 Trainer.

175.    Although Low-Tier Trainers performed Equifit sessions and PT sessions, they were primarily required to perform floor shifts.

176.    In or around August 2016, Plaintiff Katz was promoted to a Tier 3 Trainer.

177.    Trainers' weekly schedules depended on the amount of PT sessions they were required to conduct each workweek.

178.    High-Tier Trainers primary duty was performing PT sessions.

179.    Trainers usually performed approximately twenty (20) to thirty-five (35) PT sessions per workweek.

180.    Trainers did perform more than twenty-one (21) full PT sessions per week during the relevant time period.

181.    If a Trainer did not perform at least forty-two (42) full PT sessions per pay period, they were required to perform floor shifts in the subsequent pay period to acquire more PT sessions from members.

182.    Throughout her employment for Defendant, Plaintiff Katz was subjected to all of Defendant's unlawful pay policies alleged above and regularly worked in excess of forty (40) hours per workweek without any overtime pay.

183.    For example, during Plaintiff Katz's April 29, 2018, to May 12, 2018 pay period, she performed the equivalent of fifty-four (54) full hour-long PT sessions. During this pay period, Plaintiff Katz also spent approximately thirty-six (36) hours performing PT session activities and approximately thirty (30) minutes attending weekly meetings. Thus, Plaintiff Katz worked approximately ninety and a half (90½) hours during this pay period.

184.    Accordingly, for at least one (1) of the two (2) workweeks worked during this pay period, Plaintiff Katz worked in excess of forty (40) hours but was not paid a proper overtime wage.

185.    Instead, Plaintiff Katz was solely paid $1,691.00 as her fixed per PT session pay and, upon information and belief, a non-discretionary bonus of $770.00 for conducting in excess of forty-two (42) PT sessions per pay period.

186.    Notably, Plaintiff Katz's April 29, 2018, to May 12, 2018 paycheck also failed to include her overtime rate or rates of pay, the accurate number of regular hours worked, the accurate number of overtime hours worked, and Defendant's telephone number.

187.    As for another example, for the workweek of January 7, 2018, to January 13, 2018, Plaintiff Katz worked more than forty (40) hours without any overtime pay. Specifically, she worked approximately forty-five and a half hours (45½) for this workweek, which was comprised

of her performing approximately twenty-seven (27) one-hour PT sessions, PT session activities, Equifit sessions, and meetings. Upon information and belief, Plaintiff Katz also performed guided sessions during this workweek. Plaintiff Katz, however, was not paid the overtime premium of one and a half (1½) times her hourly rate for all hours worked in excess of forty (40) for the workweek of January 7, 2018, to January 13, 2018.

188. As for a further example, for the workweek of March 25, 2018, to March 31, 2018, Plaintiff Katz worked more than forty (40) hours without any overtime pay. Specifically, she worked approximately fifty and a half (50½) hours, which was comprised of her performing twenty-seven (27) one-hour PT sessions, PT session activities, Equifit sessions, and meetings. Upon information and belief, Plaintiff Katz also performed floor shifts and guided sessions during this workweek. Plaintiff Katz, however, was not paid the overtime premium of one and a half (1½) times her hourly rate for all hours worked in excess of forty (40) for the workweek of March 25, 2018, to March 31, 2018.

189. Accordingly, throughout the relevant time period, including, Plaintiff Katz was not paid the overtime premium of one and a half (1½) times her hourly rate for all her hours worked in excess of forty (40) per workweek.

190. Other Personal Training Managers, upon information and belief, also had knowledge of their subordinate High Tier Trainers uncompensated hours worked due to reviewing their clients' workout spreadsheets and weekly PT session schedules as required by Defendant.

191. Plaintiff Katz was also not compensated her promised hourly rate for all time spent performing the Hourly Rate Duties.

192. For example, Plaintiff Katz was not paid for her weekly meetings and estimates that she performed approximately twenty (20) Equifit sessions in 2019 but was only compensated for

approximately four (4).

        a.      Plaintiff Katz's NYCHRL Sexual Harassment Claims

193.    In or around April 2018, Plaintiff Katz's Fitness Manager, Mohammed Said ("Mr. Said"), unwelcomely hugged her from behind and kissed her on the neck.

194.    Plaintiff Katz immediately reported the foregoing to Mr. Szefler and submitted a written complaint to Defendant.

195.    At the time of the unlawful sexual harassment, Mr. Said was a Manager or Supervisor of Plaintiff Katz and, upon information and belief, had power to fire, supervise, and discipline Plaintiff Katz. Mr. Said also, upon information and belief, had the power to issue Plaintiff Katz instructions on how to perform her job according to Defendant's standards and policies or otherwise impact how she performed her job duties.

196.    Upon information and belief, no remedial action was ever taken in response to Plaintiff Katz's complaint of sexual harassment.

        b.      Plaintiff Katz's FMLA Interference/Retaliation and NYCHRL Discrimination and Retaliation Claims

197.    In 2019, Plaintiff Katz was diagnosed with severe depression after her father was diagnosed with Parkinson's disease.

198.    During her employment for Defendant, Plaintiff Katz and her father suffered a disability under the NYCHRL.

199.    During her employment for Defendant, Plaintiff Katz's father suffered a serious health condition under the FMLA.

200.    Plaintiff Katz's father's health conditions requires continual treatment by a physician.

201.    In December 2019, Plaintiff Katz informed Mr. Szefler of her disability and her

father's serious health condition and requested leave from December 17, 2019, to January 7, 2020, to care for her disability and for her father who has a serious health condition.

202.    Upon her return on or around January 8, 2020, Plaintiff Katz submitted the leave paperwork that she was *issued while out on leave*.

203.    Despite submitting the requisite leave paperwork, on January 15, 2020, Pete Galen, a Manager, issued Plaintiff Katz a final written warning for taking unapproved leave.

204.    On January 28, 2020, Plaintiff Katz's FMLA leave request was expressly denied by Nicole Fox ("Ms. Fox"), a third-party Integrated Claims Examiner for Defendant. Ms. Fox, however, approved her leave under the New York State Paid Family Leave Act ("NYSPFL").

205.    Although Ms. Fox approved the December 2019 leave under the NYSPFL, Defendant did not retract the final written warning for Plaintiff Katz's December 2019 leave and maintained that her leave was still considered an unapproved absence.

206.    Thus, Plaintiff Katz was denied FMLA leave for her December 2019 leave.

207.    On or around January 27, 2020, as a result of his serious health condition, Plaintiff Katz requested additional leave from February 26, 2020, to March 5, 2020, to care for her father.

208.    Mr. Szefler approved the leave request, but before doing so he stated, "You already took time off."

209.    Thereafter, Plaintiff Katz requested Mr. Szefler to amend the start date of her leave from February 26, 2020, to February 25, 2020.

210.    Mr. Szefler approved the amendment and did not require Plaintiff Katz to resubmit a leave request form.

211.    On March 4, 2020, the day before she was to return from her leave, Defendant terminated Plaintiff Katz via telephone. Darnell Serrette ("Mr. Serrette"), a General Manager for

Defendant, claimed that Plaintiff Katz's leave on February 25, 2020, was now unapproved (after she already took the leave) and made the decision to terminate Plaintiff Katz for taking unapproved leave, despite Mr. Szefler previously approving it.

212.    Notably, in terminating Plaintiff Katz, Mr. Serrette cited her active final warning for her unapproved absences during her December 2019 leave as further justification to terminate her.

213.    Plaintiff Katz was ultimately denied FMLA leave for February 25, 2020, despite being entitled to it under the FMLA.

214.    Accordingly, Defendant interfered with Plaintiff Katz's FMLA rights by reneging on its approval of her taking leave on February 25, 2020, and terminating her for it.

215.    Defendant also interfered with Plaintiff Katz's FMLA rights by denying her FMLA leave for her December 2019 absences resulting in her final written and termination.

216.    Plaintiff Katz was qualified for her position as she was employed by Defendant as a Trainer for approximately four (4) years at the time of her accommodation request.

217.    Plaintiff Katz could perform or more easily perform her job duties with the December 17, 2019, to January 7, 2020 leave accommodation.

218.    Defendant retaliated and/or discriminated against Plaintiff Katz for requesting a disability accommodation in December 2019 pursuant to the NYCHRL by placing her on a final written warning in violation of the NYCHRL.

219.    Defendant discriminated against Plaintiff Katz for her association with her father who has a disability pursuant to the NYCHRL by placing her on a final written warning and/or terminating her in violation of the NYCHRL.

220.    Upon information and belief, Plaintiff Katz was eligible and entitled to take FMLA

27

leave.

221.    Defendant had knowledge of Plaintiff Katz's father's serious health condition prior to both of her leave requests.

222.    Defendant had knowledge that both of Plaintiff Katz's leave requests were for her to tend to her father's serious health condition.

223.    Plaintiff Katz's termination was a direct result of Defendant's FMLA leave interference and/or in retaliation for her request for FMLA leave.

224.    Defendant's violations of the FMLA and the NYCHRL were willful.

**IV.    Facts Specific to Plaintiff Skidanenko**

225.    Plaintiff Skidanenko worked as a Tier 1 personal trainer at Defendant's Brooklyn Heights location.

226.    Plaintiff Skidanenko was hired by Defendant on or about July 22, 2019.

227.    Plaintiff Skidanenko's first day of work was on or about July 23, 2019.

228.    Plaintiff Skidanenko's last official day of work, due to an injury, was October 29, 2019.

229.    On January 12, 2020, Defendant informed Plaintiff Skidanenko via e-mail that her employment was terminated.

230.    As a result of her termination, Plaintiff Skidanenko lost access to her paystubs and her Equinox email address.

231.    For the first four weeks of Plaintiff Skidanenko's employment, Plaintiff Skidanenko was in Defendant's training program.

232.    Starting on or about the beginning of August 2019, Plaintiff Skidanenko began working as a Tier 1 Trainer for Defendant.

233. As a Tier 1 Trainer, Plaintiff Skidanenko usually worked at Equinox seven (7) days per week.

234. On weekdays, Plaintiff Skidanenko usually arrived at work between 5:30 am and 7:00 am and would leave on average at around 9:00 pm. Sometimes, though, Plaintiff would stay as late as 10:00 pm or 11:00 pm.

235. Plaintiff Skidanenko worked on average a minimum of ten (10) hours a day during the week.

236. During weeks where Plaintiff Skidanenko worked a minimum of ten (10) hour days, she was paid less than New York State's minimum wage for all hours worked and was not provided with any "spread of hours" pay.

237. On weekends, Plaintiff Skidanenko would usually arrive to work at 7:00 am and would leave between 1:00 pm and 3:00 pm. On weekends, Plaintiff Skidanenko again was on the floor performing the same tasks that she did during floor shifts.

238. Plaintiff Skidanenko was only paid for a portion of her labor at Defendant, namely for scheduled floor sessions, training at EFTI, meetings and personal training sessions. The remainder of the hours Plaintiff Skidanenko worked were uncompensated.

239. Thus, Plaintiff Skidanenko was unpaid for most hours of her employment, including: recruiting personal training clients for Defendant, designing training programs for those clients assigned to her, and traveling to and from EFTI, which courses were held in a Manhattan location.

240. During floor shifts, Plaintiff Skidanenko would put back weights and remove mats and towels from the floor.

241. On the floor, Plaintiff Skidanenko would physically assist patrons with their

workouts and answer their questions and recruit patrons for training sessions.

242. Plaintiff Skidanenko was assigned approximately five (5) floor shifts per week.

243. Plaintiff Skidanenko performed approximately six (6) hours per week on PT session activities for approximately eight (8) or nine (9) PT sessions per week.

244. Plaintiff Skidanenko had between approximately two (2) to three (3) EFTI sessions per week and they lasted approximately two (2) hours.

245. These EFTI sessions were not in the Brooklyn Heights location, but were located instead usually in Tribeca, and sometimes in Dumbo.

246. Plaintiff Skidanenko would travel from the Brooklyn Heights location to attend the EFTI sessions, and would travel back to the Brooklyn Heights location once these sessions were concluded.

247. Plaintiff Skidanenko was not compensated for her travel time to and from the EFTI sessions.

248. EFTI sessions also had "homework" that had to be completed by the trainers.  The time that Trainers spent completing "homework" was uncompensated.

249. Plaintiff Skidanenko also was required to attend Ramper Meetings, which were specifically for Low-Tier Trainers.

250. During Ramper Meetings, Low-Tier Trainers would be told how to recruit clients more effectively.

251. Ramper Meetings were held two times per week, for one hour each.

252. Plaintiff Skidanenko was also required to attend one hour-long meeting per month for all employees of the Brooklyn Heights location.

253. Similar to the Ramper Meetings it was emphasized to Plaintiff Skidanenko, by

Defendant's management that she should be on the floor as much as possible to obtain clients.

a. Plaintiff Skidanenko's and the Low-Tier Trainers' Scheduling

254. Plaintiff Skidanenko had a login to Defendant's database through the Defendant's website, where she could access her schedule, Equinox email, training session plans and EFTI homework.

255. Plaintiff Skidanenko could not control the schedule of her floor shifts, EFTI or the meetings.

256. John Jenkins ("Mr. Jenkins") and Emiliano Tramontozzi ("Mr. Tramontozzi") were Plaintiff Skidanenko's Personal Training Managers.

257. Mr. Jenkins and Mr. Tramontozzi organized the schedules of the Low-Tier Trainers and Plaintiff Skidanenko's location.

258. Plaintiff Skidanenko coordinated her personal training sessions around her scheduled floor shifts, EFTI and meetings and around her clients' availability.

259. Given these scheduling constrictions, there were approximately only four (4) days throughout her entire period of employment when she did not work.   .

260. These same scheduling restrictions that Plaintiff Skidanenko experienced also apply to all other Low-Tier Trainers.

261. In other words, other Low-Trier Trainers, with only possibly only narrow exceptions, didn't have any control or influence over their own schedules.

262. Defendant, by deliberately assigning Low-Trier Trainers erratic schedules, ensured that Low-Tier Trainers will be compelled to remain on the premises and perform unpaid floor shifts.

263. Plaintiff Skidanenko complained about the erratic shifts which resulted in many

hours of uncompensated work time.  As a result of her complaint, she was orally reprimanded by one of her managers.

264.     During that reprimand, Plaintiff Skidanenko was encouraged to spend more time unpaid preparing for her personal training sessions and more time recruiting new personal training clients on behalf of Defendant.

265.     As the other class members, Plaintiff Skidanenko's uniform consisted of two shirts, a dark gray and a light gray, both with the word "TRAIN" on the front and with the Defendant's logo on the back.

266.     Plaintiff Skidanenko wore the dark gray shirt during training sessions, indicating that she was working with a client and therefore should not be approached by other gym patrons.

267.     Plaintiff Skidanenko was to wear the light gray shirt during floor shifts, indicating that she was available to help patrons.

268.     Between floor shifts, meetings and personal training sessions, Plaintiff Skidanenko generally wore her light gray shirt and would frequently work on the floor but would not be paid for her labor.

269.     Specifically, Plaintiff Skidanenko would perform the same tasks that she would perform on her floor shifts.  This included, but was not limited to, returning weights, removing used towels and recruiting patrons to be her clients.

270.     Plaintiff Skidanenko partook in this task because she was compelled by management to recruit clients when she was not being paid by Defendant.

271.     Indeed, when Plaintiff Skidanenko was not meeting expectations of personal training sessions, Mr. Tramontozzi issued a performance improvement plan including instructing Plaintiff Skidanenko to be on the floor more. Yet, Plaintiff Skidanenko was not being compensated

for that time.

272.     When Plaintiff Skidanenko failed to recruit a client, Mr. Tramontozzi would ask Plaintiff Skidanenko whether Plaintiff Skidanenko had been practicing what he had been telling her to do in the Ramper Meetings, specifically whether she was practicing the recommended techniques for recruiting clients, which included a written "speech" to be recited to the clients Plaintiff Skidanenko.

273.     Plaintiff Skidanenko was instructed to learn this "speech" on her own time and without pay.

        b.     Plaintiff Skidanenko's Wages

274.     Plaintiff Skidanenko was required by Defendant to be paid New York State minimum wage of $15.00 for floor shifts, training hours and team meetings.  However, Plaintiff Skidanenko was not paid for travel time to attend meetings at Defendant's Manhattan locations.

275.     Plaintiff Skidanenko, as a Tier 1 trainer, was paid $26.00 per hour-long training session.

276.     Plaintiff Skidanenko consistently worked more than forty (40) hours per week.

277.     On average, as is set forth in more detail above, Plaintiff worked sixty (60) to sixty-five (65) hours (or more) a week.

278.     Plaintiff Skidanenko's effective rate of pay as a result was less than the Federal minimum wage rate of $7.25 per hour.

279.     In addition, Plaintiff Skidanenko's effective rate of pay was less than the New York state minimum wage rate.

280.     By way of example but not limitation, Plaintiff Skidanenko worked at least sixty-five (65) hours during both the workweeks of September 9, 2019, to September 15, 2019, and

September 16, 2019 to September 22, 2019. She, however, was only paid a total $930.55 for these two (2) workweeks. Therefore, her effective wage rate was no more than $7.15 for each of these workweeks, which is less than New York State's and the federal minimum wage.

281. Even though Plaintiff Skidanenko worked more than forty (40) hours a week, including during the workweeks of September 9, 2019, and September 16, 2019, Plaintiff was never paid one and a half times her regular rate for overtime hours. Rather, she was only paid her straight rate for some of the hours worked and her flat PT session rate.

282. Plaintiff Skidanenko was also never provided accurate wage statements as required by the NYLL.

283. Plaintiff Skidanenko's wage statements did not accurately list the hours that she worked.

## FLSA COLLECTIVE ACTION ALLEGATIONS

### I.    The High-Tier Trainer Collective

284. Plaintiff Katz seeks to bring this suit as a collective action pursuant to 29 U.S.C. § 216(b) on her own behalf as well as those in the following Collective:

> All Tier 3, Tier 3+, and Tier X Trainers employed by Defendant within the State of New York from May 13, 2018, through the final date of disposition of this action, who are or were required to work in excess of forty (40) hours per workweek without compensation at the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek.

285. At all relevant times, Plaintiff Katz was similarly situated to all such individuals in the High-Tier Trainer Collective[2] because, while employed by Defendant, Plaintiff Katz and all HTT Collective Plaintiffs performed similar tasks, were subject to the same laws and regulations, were paid in the same or substantially similar manner, were paid the same or similar rate, were

---

[2] Hereinafter referred to as the "HTT Collective Plaintiffs."

required to work in excess of forty (40) hours per workweek and were subject to Defendant's policies and practices of willfully failing to pay them at the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek.

286. Defendant is and has been aware of the requirement to pay Plaintiff Katz and the HTT Collective Plaintiffs at a rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek, yet willfully chose not to.

287. The HTT Collective Plaintiffs, are readily discernable and ascertainable. All HTT Collective Plaintiffs' contact information is readily available in Defendant's records. Notice of this collective action can be made as soon as the Court determines it appropriate to do so.

288. The number of HTT Collective Plaintiffs in the collective are too numerous to join in a single action, necessitating collective recognition.

289. All questions relating to Defendant's violation of the FLSA share a common factual basis as set forth herein. No claims under the FLSA relating to Defendant's failure to pay statutorily required rate of one and a half (1½) times the HTT Collective Plaintiffs' hourly rate for all hours worked in excess of forty (40) per workweek are specific to Plaintiff Katz and the claims asserted by Plaintiff Katz are typical of those of members of the HTT Collective.

290. Plaintiff Katz will fairly and adequately represent the interests of the HTT Collective and have no interests conflicting with the HTT Collective.

291. A collective action is superior to all other methods and is necessary in order to fairly and completely litigate violations of the FLSA.

292. Plaintiff Katz's attorneys are familiar and have experience with collective and class action litigation, as well as employment and labor law litigation.

293. The public will benefit from the case being brought as a collective action because

doing so will serve the interests of judicial economy by reducing a multitude of claims to a single litigation. Prosecution of separate actions by individual HTT Collective Plaintiffs creates a risk for varying results based on identical fact patterns as well as disposition of the collective's interests without their knowledge or contribution.

294.     The questions of law and fact are nearly identical for all HTT Collective Plaintiffs and therefore proceeding as a collective action is ideal. Without judicial resolution of the claims asserted on behalf of the proposed collective, Defendant's continued violations of the FLSA will undoubtedly continue.

## II.     The Low-Tier Trainer Collective

295.     Plaintiff Skidanenko seeks to bring this suit as a collective action pursuant to 29 U.S.C. § 216(b) on her own behalf as well as those in the following Collective:

> All Tier 1 and Tier 2 Trainers employed by Defendant within the State of New York from December 3, 2018, through the final date of disposition of this action, who are or were: (i) required to work in excess of forty (40) hours per workweek without compensation at the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; and/or (ii) were not paid the federal minimum rate for all hours worked per workweek.

296.     At all relevant times, Plaintiff Skidanenko was similarly situated to all such individuals in the Low-Tier Trainer Collective[3] because, while employed by Defendant, Plaintiff Skidanenko and all LTT Collective Plaintiffs performed similar tasks, were subject to the same laws and regulations, were paid in the same or substantially similar manner, were paid the same or similar rate, were required to work in excess of forty (40) hours per workweek, and were subject to Defendant's policies and practices of willfully failing to pay them at the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per

---

[3] Hereinafter referred to as the "LTT Collective Plaintiffs."

workweek and a rate lower than the federal minimum.

297. Defendant is and has been aware of the requirement to pay Plaintiff Skidanenko and the LTT Collective Plaintiffs at a rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek and the federal minimum rate, yet willfully chose not to.

298. The LTT Collective Plaintiffs, are readily discernable and ascertainable. All LTT Collective Plaintiffs' contact information is readily available in Defendant's records. Notice of this collective action can be made as soon as the Court determines it appropriate to do so.

299. The number of LTT Collective Plaintiffs in the collective are too numerous to join in a single action, necessitating collective recognition.

300. All questions relating to Defendant's violation of the FLSA share a common factual basis as set forth herein. No claims under the FLSA relating to Defendant's failure to pay statutorily required minimum rate and rate of one and a half (1½) times the LTT Collective Plaintiffs' hourly rate for all hours worked in excess of forty (40) per workweek are specific to Plaintiff Skidanenko and the claims asserted by Plaintiff Skidanenko are typical of those of members of the LTT Collective.

301. Plaintiff Skidanenko will fairly and adequately represent the interests of the LTT Collective and have no interests conflicting with the LTT Collective.

302. A collective action is superior to all other methods and is necessary in order to fairly and completely litigate violations of the FLSA.

303. Plaintiff Skidanenko's attorneys are familiar and have experience with collective and class action litigation, as well as employment and labor law litigation.

304. The public will benefit from the case being brought as a collective action because

doing so will serve the interests of judicial economy by reducing a multitude of claims to a single litigation. Prosecution of separate actions by individual LTT Collective Plaintiffs creates a risk for varying results based on identical fact patterns as well as disposition of the collective's interests without their knowledge or contribution.

305. The questions of law and fact are nearly identical for all LTT Collective Plaintiffs and therefore proceeding as a collective action is ideal. Without judicial resolution of the claims asserted on behalf of the proposed collective, Defendant's continued violations of the FLSA will undoubtedly continue.

## FED. R. CIV. P. 23 CLASS ACTION ALLEGATIONS

### I.    The High-Tier Trainer Class

306. Plaintiff Katz seeks to maintain this action as a class action pursuant to FED. R. CIV. P. 23, on behalf of those who, during the previous six (6) years, were subjected to violations of the NYLL and the NYCRR.

307. The High-Tier Trainer Class which Plaintiff Katz seeks to define includes:

> All Tier 3, Tier 3+, and Tier X Trainers employed by Defendant from November 23, 2014, through the final date of disposition of this action, who are or were: (i) not paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) not paid all of their earned and due wages on their regularly scheduled paydays/had their wages unlawfully deducted; (iii) not paid on a weekly basis; and/or (iv) not issued the proper wage statements pursuant to the NYLL.

308. The number of class members protected by the NYLL and the NYCRR who have suffered under Defendant's violations of the NYLL and the NYCRR as set forth herein, are in excess of forty (40) and thus are too numerous to join in a single action, necessitating class recognition.

309. All questions relating to the High-Tier Trainer Class's allegations under the NYLL

and the NYCRR share a common factual basis with those raised by the claims of Plaintiff Katz. No claims asserted herein under the NYLL and the NYCRR are specific to Plaintiff Katz or any proposed High-Tier Trainer Class member and the claims of Plaintiff Katz are typical of those asserted by the proposed High-Tier Trainer Class.

310.    Plaintiff Katz will fairly and adequately represent the interests of all members of the proposed High-Tier Trainer Class.

311.    A class action is superior to all other methods of adjudication and is necessary in order to fairly and completely litigate the High-Tier Trainer Class's allegations that Defendant violated the NYLL and the NYCRR.

312.    The class members of the proposed High-Tier Trainer Class are readily discernable and ascertainable. Contact information for all members of the proposed High-Tier Trainer Class[4] is readily available from Defendant since such information is likely to be contained in their personnel files. Notice of this class action can be provided by any means permissible under the FED. R. CIV. P. 23 requirements.

313.    Plaintiff Katz asserts these claims on her own behalf as well as on behalf of the HTT Class Plaintiff through her attorneys who are experienced in class action litigation as well as employment litigation.

314.    Plaintiff Katz is able to fairly represent and properly protect the interests of the absent members of the proposed High-Tier Trainer Class and have no interests conflicting with those of the High-Tier Trainer Class.

315.    The public will benefit from this case being brought as a class action because it serves the interests of judicial economy by saving the Court's time and effort and by reducing a

---

[4] Hereinafter referred to as the "HTT Class Plaintiffs."

multitude of claims to a single litigation. Prosecution of separate actions by individual HTT Class Plaintiffs creates a risk of varying results based on identical fact patterns as well as disposition of the classes' interests without their knowledge or contribution.

316.     Due to the nature of wage and hour claims brought during the course of employment, class members are often fearful of filing claims against their employers and would benefit from Plaintiff Katz's willingness to proceed against Defendant. The anonymity inherent in a class action suit further provides insulation against retaliation and/or undue stress and fear for the HTT Class Plaintiffs' jobs and continued employment.

317.     The questions of law and fact that are nearly identical for all class members make proceeding as class action ideal. Without judicial resolution of the claims asserted on behalf of the proposed High-Tier Trainer Class, continued violations of the NYLL and the NYCRR will undoubtedly continue.

318.     Whether Plaintiff Katz and the HTT Class Plaintiffs were: (i) paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) paid all of their earned and due wages on their regularly scheduled paydays; (iii) paid on a weekly basis; and/or (iv) issued the proper wage statements pursuant to the NYLL are common questions which can readily be resolved through the class action process.

**II.     The Low-Tier Trainer Class**

319.     Plaintiffs seek to maintain this action as a class action pursuant to Fed. R. Civ. P. 23, on behalf of those who, during the previous six (6) years, were subjected to violations of the NYLL.

320.     The Low-Tier Trainer Class which Plaintiffs seek to define includes:

> All Tier 1 and Tier 2  Trainers employed by Defendant from March 25, 2014, through the final date of disposition of this action, who are

or were: (i) not paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) not paid New York State's Minimum Wage for all hours worked per week; (iii) not paid all of their earned and due wages on their regularly scheduled paydays/had their wages unlawfully deducted; (iv) not paid on a weekly basis; (v) not paid "spread of hours" pay for each day worked in excess of ten (10) hours; and/or (vi) not issued the proper wage statements pursuant to the NYLL.

321.    The number of class members protected by the NYLL who have suffered under Defendant's violations of the NYLL as set forth herein, are in excess of forty (40) and thus are too numerous to join in a single action, necessitating class recognition.

322.    All questions relating to the Low-Tier Class's allegations under the NYLL share a common factual basis with those raised by the claims of Plaintiffs. No claims asserted herein under the NYLL are specific to Plaintiffs or any proposed Low-Tier Trainer Class member and the claims of Plaintiffs are typical of those asserted by the proposed Low-Tier Trainer Class.

323.    Plaintiffs will fairly and adequately represent the interests of all members of the proposed Low-Tier Trainer Class.

324.    A class action is superior to all other methods of adjudication and is necessary in order to fairly and completely litigate the Low-Tier Trainer Class's allegations that Defendant violated the NYLL.

325.    The class members of the proposed Low-Tier Trainer Class are readily discernable and ascertainable. Contact information for all members of the proposed Low-Tier Trainer Class[5] is readily available from Defendant since such information is likely to be contained in their personnel files. Notice of this class action can be provided by any means permissible under the FED. R. CIV. P. 23 requirements.

---

[5] Hereinafter referred to as the "LTT Class Plaintiffs."

326.     Plaintiffs assert these claims on their own behalf as well as on behalf of the LTT Class Plaintiffs through their attorneys who are experienced in class action litigation as well as employment litigation.

327.     Plaintiffs are able to fairly represent and properly protect the interests of the absent members of the proposed Low-Tier Trainer Class and have no interests conflicting with those of the Low-Tier Trainer Class.

328.     The public will benefit from this case being brought as a class action because it serves the interests of judicial economy by saving the Court's time and effort and by reducing a multitude of claims to a single litigation. Prosecution of separate actions by individual LTT Class Plaintiffs creates a risk of varying results based on identical fact patterns as well as disposition of the classes' interests without their knowledge or contribution.

329.     Due to the nature of wage and hour claims brought during the course of employment, class members are often fearful of filing claims against their employers and would benefit from Plaintiffs' willingness to proceed against Defendant. The anonymity inherent in a class action suit further provides insulation against retaliation and/or undue stress and fear for the LTT Class Plaintiffs' jobs and continued employment.

330.     The questions of law and fact that are nearly identical for all class members make proceeding as class action ideal. Without judicial resolution of the claims asserted on behalf of the proposed Low-Tier Trainer Class, continued violations of the NYLL will undoubtedly continue.

331.     Whether Plaintiffs and the LTT Class Plaintiffs were: (i) paid the statutorily required rate of one and a half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek; (ii) paid New York State's minimum wage for all hours worked per week; (iii) paid all of their earned and due wages on their regularly scheduled paydays; (iv) paid on a weekly

basis; (v) paid "spread of hours" pay for each day worked in excess of ten (10) hours; and/or (vi) issued the proper wage statements pursuant to the NYLL are common questions which can readily be resolved through the class action process.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**The Fair Labor Standards Act, 29 U.S.C. § 207, Made by Plaintiff Katz on Behalf of
All HTT Collective Plaintiffs
(Failure to Pay Overtime)**

332.    Plaintiff Katz and the HTT Collective Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

333.    Throughout the period covered by the applicable statute of limitations, Plaintiff Katz and other HTT Collective Plaintiffs were required to work and did in fact work in excess of forty (40) hours per workweek.

334.    Throughout the period covered by the applicable statute of limitations, Defendant knowingly failed to pay Plaintiff Katz and the HTT Collective Plaintiffs the statutorily required overtime rate for all hours worked in excess of forty (40) per workweek.

335.    Defendant's conduct was willful and lasted for the duration of the relevant time period.

336.    Defendant's conduct was in violation of the Fair Labor Standards Act, 29 U.S.C. § 207.

### AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
**The Fair Labor Standards Act, 29 U.S.C. § 207, Made by Plaintiff Skidanenko on Behalf of
All LTT Collective Plaintiffs
(Failure to Pay Overtime)**

337.    Plaintiff Skidanenko and the LTT Collective Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

338.    Throughout the period covered by the applicable statute of limitations, Plaintiff

Skidanenko and other LTT Collective Plaintiffs were required to work and did in fact work in excess of forty (40) hours per workweek.

339.  Throughout the period covered by the applicable statute of limitations, Defendant knowingly failed to pay Plaintiff Skidanenko and the LTT Collective Plaintiffs the statutorily required overtime rate for all hours worked in excess of forty (40) per workweek.

340.  Defendant's conduct was willful and lasted for the duration of the relevant time period.

341.  Defendant's conduct was in violation of the Fair Labor Standards Act, 29 U.S.C. § 207.

## AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
**The Fair Labor Standards Act, 29 U.S.C. § 206, Made by Plaintiff Skidanenko on Behalf of LTT Collective Plaintiffs**
**(Failure to Federal Minimum Wage)**

342.  Plaintiff Skidanenko and the LTT Collective Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

343.  Throughout the period covered by the applicable statute of limitations, Defendant failed to pay Plaintiff Skidanenko and the LTT Collective Plaintiffs the federal minimum wage for all hours worked per week.

344.  Defendant's conduct was willful and lasted for the duration of the relevant time period.

345.  Defendant's conduct was in violation the Fair Labor Standards Act, 29 U.S.C. § 206.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF
**The New York Labor Law and the New York Codes, Rules, and Regulations § 142-1.4**
**Made by Plaintiff Katz on Behalf of HTT Class Plaintiffs**
**(Failure to Pay Overtime)**

346.  Plaintiff Katz and the HTT Class Plaintiffs re-allege and incorporate by reference

all allegations in all preceding paragraphs.

347. Throughout the period covered by the applicable statute of limitations, Plaintiff Katz and other HTT Class Plaintiffs were required to work and did in fact work in excess of forty (40) hours per workweek.

348. Throughout the period covered by the applicable statute of limitations, Defendant knowingly failed to pay Plaintiff Katz and the HTT Class Plaintiffs the statutorily required overtime rate for all hours worked in excess of forty (40) per workweek.

349. Defendant's conduct was willful and lasted for the duration of the relevant time period.

350. Defendant's conduct was in violation of the New York Labor Law and the New York Codes, Rules, and Regulations § 146-1.4.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law and the New York Codes, Rules, and Regulations § 142-1.4**
**Made by Plaintiffs on Behalf of LTT Class Plaintiffs**
**(Failure to Pay Overtime)**

351. Plaintiffs and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

352. Throughout the period covered by the applicable statute of limitations, Plaintiffs and other LTT Class Plaintiffs were required to work and did in fact work in excess of forty (40) hours per workweek.

353. Throughout the period covered by the applicable statute of limitations, Defendant knowingly failed to pay Plaintiffs and the LTT Class Plaintiffs the statutorily required overtime rate for all hours worked in excess of forty (40) per workweek.

354. Defendant's conduct was willful and lasted for the duration of the relevant time period.

355.    Defendant's conduct was in violation of the New York Labor Law and the New York Codes, Rules, and Regulations § 146-1.4.

### AS AND FOR A SIXTH CAUSE OF ACTION FOR A VIOLATION OF
**The New York Labor Law § 652, Made by Plaintiff Skidanenko on Behalf of LTT Class Plaintiffs**
**(Failure to New York State Minimum Wage)**

356.    Plaintiff Skidanenko and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

357.    Throughout the period covered by the applicable statute of limitations, Defendant failed to pay Plaintiff Skidanenko and the LTT Class Plaintiffs New York State's applicable minimum wage for all hours worked per week.

358.    Defendant's conduct was willful and lasted for the duration of the relevant time period.

359.    Defendant's conduct was in violation of the New York Labor Law § 652.

### AS AND FOR A SEVENTH CAUSE OF ACTION FOR A VIOLATION OF
**The New York Labor Law § 191(1)(d) Made by Plaintiff Katz on Behalf of All HTT Class Plaintiffs**
**(Failure to Pay All Earned and Due Wages)**

360.    Plaintiff Katz and the HTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

361.    Throughout the period covered by the applicable statute of limitations, every two-weeks Defendant was required to pay Plaintiff Katz and other HTT Class Plaintiffs all earned and due wages.

362.    Throughout the period covered by the applicable statute of limitations, Defendant promised Plaintiff Katz and the HTT Class Plaintiffs' New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, attending meetings, commuting to

EFTI meetings, and completing Equifit homework.

363. Throughout the period covered by the applicable statute of limitations, Defendant did not pay Plaintiff and other HTT Class Plaintiffs New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, and completing Equifit homework on their scheduled payday in which the wages were due.

364. Defendant's conduct was willful and lasted for the duration of the relevant time period.

365. Defendant's conduct was in violation of the New York Labor Law § 191(1)(d).

**AS AND FOR AN EIGHTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law § 191(1)(d) Made by Plaintiffs on Behalf of**
**All LTT Class Plaintiffs**
**(Failure to Pay All Earned and Due Wages)**

366. Plaintiffs and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

367. Throughout the period covered by the applicable statute of limitations, every two-weeks Defendant was required to pay Plaintiffs and other LTT Class Plaintiffs all earned and due wages.

368. Throughout the period covered by the applicable statute of limitations, Defendant promised Plaintiffs and the LTT Class Plaintiffs' New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, performing unpaid on "the floor shifts" and completing Equifit homework.

369. Throughout the period covered by the applicable statute of limitations, Defendant did not pay Plaintiffs and other LTT Class Plaintiffs New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, working uncompensated on "the floor"

shifts, attending meetings, commuting to EFTI meetings, and completing Equifit homework on their scheduled payday in which the wages were due.

370. Defendant's conduct was willful and lasted for the duration of the relevant time period.

371. Defendant's conduct was in violation of the New York Labor Law § 191(1)(d).

### AS AND FOR A NINTH CAUSE OF ACTION FOR A VIOLATION OF
**The New York Labor Law § 191(1)(a) Made by Plaintiff Katz on Behalf of All HTT Class Plaintiffs**
**(Frequency of Pay)**

372. Plaintiff Katz and the HTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

373. Throughout the relevant time period, Plaintiff Katz and the HTT Class Plaintiffs were paid on a bi-weekly basis.

374. Throughout the relevant time period Plaintiff Katz and the HTT Class Plaintiffs spent 25% or more of their working time engaged in physical labor.

375. Defendant knowingly failed to pay Plaintiff Katz and the HTT Class Plaintiffs on a weekly basis.

376. Defendant's conduct was in violation of the New York Labor Law § 191(1)(a).

### AS AND FOR A TENTH CAUSE OF ACTION FOR A VIOLATION OF
**The New York Labor Law § 191(1)(a) Made by Plaintiffs on Behalf of All LTT Class Plaintiffs**
**(Frequency of Pay)**

377. Plaintiffs and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

378. Throughout the relevant time period, Plaintiffs and LTT Class Plaintiffs were paid on a bi-weekly basis.

379.     Throughout the relevant time period Plaintiffs and LLT Class Plaintiffs spent 25% or more of their working time engaged in physical labor.

380.     Defendant knowingly failed to pay Plaintiffs and LTT Class Plaintiffs on a weekly basis.

381.     Defendant's conduct was in violation of the New York Labor Law § 191(1)(a).

## AS AND FOR AN ELEVENTH CAUSE OF ACTION FOR A VIOLATION OF
### The New York Labor Law § 193 Made by Plaintiff Katz on Behalf of
### All HTT Class Plaintiffs
### (Deduction of Wages)

382.     Plaintiff Katz and the HTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

383.     Throughout the period covered by the applicable statute of limitations, Defendant promised Plaintiff Katz and the HTT Class Plaintiffs' New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, and completing Equifit homework.

384.     Throughout the period covered by the applicable statute of limitations, Defendant withheld some or all of Plaintiff Katz's and other HTT Class Plaintiffs' wages for their time spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, and completing Equifit homework.

385.     Throughout the period covered by the applicable statute of limitations, Defendant unlawfully deducted Plaintiff Katz's and other HTT Class Plaintiffs' wages.

386.     Defendant's conduct was willful and lasted for the duration of the relevant time period.

387.     Defendant's conduct was in violation of the New York Labor Law § 193.

**AS AND FOR A TWELFTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law § 193 Made by Plaintiffs on Behalf of**
**All LTT Class Plaintiffs**
**(Deduction of Wages)**

388.     Plaintiffs and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

389.     Throughout the period covered by the applicable statute of limitations, Defendant promised Plaintiffs and the LTT Class Plaintiffs' New York State's applicable minimum wage for each hour spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, and completing Equifit homework.

390.     Throughout the period covered by the applicable statute of limitations, Defendant withheld some or all of Plaintiffs' and other LTT Class Plaintiffs' wages for their time spent performing Equifit and guided sessions, attending meetings, commuting to EFTI meetings, and completing Equifit homework.

391.     Throughout the period covered by the applicable statute of limitations, Defendant unlawfully deducted Plaintiffs' and other LTT Class Plaintiffs' wages.

392.     Defendant's conduct was willful and lasted for the duration of the relevant time period.

393.     Defendant's conduct was in violation of the New York Labor Law § 193.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law § 195, Made by Plaintiff Katz on Behalf of**
**All HTT Class Plaintiffs**
**(Failure to Provide Proper Wage Statements)**

394.     Plaintiff Katz and the HTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

395.     Pursuant to the NYLL, employers are required to furnish employees with every

payment of wages a statement that includes, among other things, their overtime rate or rates of pay, the accurate number of regular hours worked, the accurate number of overtime hours worked, and its telephone number.

396. Throughout the relevant time period, Defendant's knowingly failed to provide Plaintiff Katz and the HTT Class Plaintiffs with the required wage statements and notices pursuant to NYLL.

397. Defendant's conduct was willful and lasted for the duration of the relevant time period.

398. Defendant's conduct was in violation of New York Labor Law § 195.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law § 195, Made by Plaintiffs on Behalf of**
**All LTT Class Plaintiffs**
**(Failure to Provide Proper Wage Statements)**

399. Plaintiffs and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

400. Pursuant to the NYLL, employers are required to furnish employees with every payment of wages a statement that includes, among other things, their overtime rate or rates of pay, the accurate number of regular hours worked, the accurate number of overtime hours worked, and its telephone number.

401. Throughout the relevant time period, Defendant's knowingly failed to provide Plaintiffs and the LTT Class Plaintiffs with the required wage statements and notices pursuant to NYLL.

402. Defendant's conduct was willful and lasted for the duration of the relevant time period.

403. Defendant's conduct was in violation of New York Labor Law § 195.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York Labor Law and the New York Codes, Rules, and Regulations § 142-2.4**
**Made by Plaintiff Skidanenko on Behalf of All LTT Class Plaintiffs**
**("Spread of Hours" Pay)**

404. Plaintiff Skidanenko and the LTT Class Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

405. Throughout the relevant time period, Plaintiff Skidanenko and the LTT Class Plaintiffs worked in excess of ten (10) hours per day and earned or earned less than New York State's applicable minimum wage.

406. Plaintiff Skidanenko and the LTT Class Plaintiffs were/are entitled to "spread of hours" pay for each day worked in excess of ten (10) hours.

407. Defendant knowingly failed to pay Plaintiff Skidanenko and LTT Class Plaintiffs the "spread of hours" pay for each day worked in excess of ten (10) hours.

408. Defendant's conduct was willful and lasted for the duration of the relevant time period.

409. Defendant's conduct was in violation of the New York Labor Law and the New York Codes, Rules, and Regulations § 142.2.4.

**AS AND FOR A SIXTEENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York City Human Rights Law § 8-107, made by Plaintiff Katz**
**(Sexual Harassment)**

410. Plaintiff Katz repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

411. Plaintiff Katz is a female and is thus a member of a protected class pursuant to the NYCHRL.

412. Plaintiff Katz was sexually harassed by one of her Managers.

413. Upon information and belief, Defendant failed to take immediate and appropriate

action in response to Plaintiff Katz's complaints of sexual harassment.

414.     Defendant's conduct was willful and in violation of the New York City Human Rights Law § 8-107.

## **AS AND FOR A SEVENTEENTH CAUSE OF ACTION FOR A VIOLATION OF**
### **The Family and Medical Leave Act, 29 U.S.C. § 2615, made by Plaintiff Katz**
### **(FMLA Interference)**

415.     Plaintiff Katz repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

416.     Upon information and belief, Plaintiff Katz was eligible for FMLA leave as she worked one thousand two hundred and fifty (1,250) or more hours within the twelve (12) month period immediately preceding her requests for FMLA leave.

417.     In December 2019, Plaintiff Katz informed Defendant of her father's serious health condition and requested FMLA leave from December 17, 2019, to January 7, 2020.

418.     Defendant denied Plaintiff Katz's December 2019 FMLA leave request.

419.     On or around January 27, 2020, Plaintiff Katz requested leave to care for her father's serious health condition from February 25, 2020, to March 5, 2020.

420.     Defendant reneged its authorization for Plaintiff Katz to take leave on February 25, 2020, after she already took it. Accordingly, Plaintiff Katz was ultimately denied FMLA leave for February 25, 2020.

421.     Defendant terminated Plaintiff Katz the day before she was scheduled to return to work from her second leave.

422.     Defendant unlawfully interfered with Plaintiff Katz's right to use FMLA leave by reneging on its approval of her February 25, 2020 leave and terminating her for it and/or denying her leave in December 2019 resulting in her final written and subsequent termination.

423.    Defendant's conduct was willful and in violation of the Family Medical Leave Act, 29 U.S.C. § 2615.

## AS AND FOR AN EIGHTEENTH  CAUSE OF ACTION FOR A VIOLATION OF
### The Family and Medical Leave Act, 29 U.S.C. § 2615, made by Plaintiff Katz
### (FMLA Retaliation)

424.    Plaintiff Katz repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

425.    In December 2019, Plaintiff Katz informed Defendant of her father's serious health condition.

426.    In December 2019, Plaintiff Katz requested FMLA leave from December 17, 2019, to January 7, 2020. Plaintiff Katz was ultimately denied FMLA leave and issued a final written warning for taking off on the aforementioned days.

427.    On or around January 27, 2020, Plaintiff Katz requested and received leave to care for her father's serious health condition from February 25, 2020, to March 5, 2020

428.    Defendant terminated Plaintiff Katz the day before she was scheduled to return to work from her leave for taking leave on February 25, 2020.

429.    Plaintiff Katz's termination was in retaliation for her requesting and/or receiving FMLA leave.

430.    Defendant's conduct was willful and in violation of the Family Medical Leave Act, 29 U.S.C. § 2615.

## AS AND FOR A NINETEENTH CAUSE OF ACTION FOR A VIOLATION OF
### The New York City Human Rights Law § 8-107, made by Plaintiff Katz
### (Retaliation)

431.    Plaintiff Katz repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

432.    During her employment for Defendant, Plaintiff Katz suffered from severe depression which is a psychological impairment and impaired her mental capabilities and her ability to sleep.

433.    During her employment for Defendant, Plaintiff Katz had a disability under the NYCHRL.

434.    In December 2019, Plaintiff Katz requested a disability accommodation consisting of short term definite leave from December 16, 2019, to January 10, 2020.

435.    Plaintiff Katz's request for an accommodation was approved prior to her taking it.

436.    On January 15, 2020, Plaintiff Katz was unlawfully issued a final written warning in retaliation for her request for a disability accommodation.

437.    Defendant's conduct was willful and in violation of the New York City Human Rights Law § 8-107.

## AS AND FOR A TWENTIETH CAUSE OF ACTION FOR A VIOLATION OF
### The New York City Human Rights Law § 8-107, made by Plaintiff Katz
### (Discrimination)

438.    Plaintiff Katz repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

439.    During her employment for Defendant, Plaintiff Katz suffered from severe depression which is a psychological impairment and impaired her mental capabilities and her ability to sleep.

440.    During her employment for Defendant, Plaintiff Katz's father suffered from Parkinson's disease, which is, among other things, a physical impairment and impairs his ability to walk, talk, and lift.

441.    During her employment for Defendant, Plaintiff Katz had a disability under the

NYCHRL.

442. During her employment for Defendant, Plaintiff Katz's father had a disability under the NYCHRL.

443. In December 2019, Plaintiff Katz requested a disability accommodation consisting of short term definite leave from December 16, 2019, to January 10, 2020.

444. Plaintiff Katz's request for an accommodation was approved prior to her taking it.

445. On January 15, 2020, Plaintiff Katz was unlawfully issued a final written warning on the basis of her disability and/or on the basis of her association with her father who also has a disability.

446. Defendant unlawfully terminated Plaintiff Katz on basis of her association with her father who also has a disability.

447. Defendant's conduct was willful and in violation of the New York City Human Rights Law § 8-107.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and all Collective and Class Plaintiffs demand judgment against Defendant as follows:

A. At the earliest possible time, Plaintiffs should be allowed to give notice of the purported Collective, or the Court should issue such notice, to all members of the purported Collectives, defined herein. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages and/or benefits;

B. Designation of Plaintiffs as representative of the FLSA Collectives defined herein, and Plaintiffs' counsel as Collective Counsel;

C.      Designation of Plaintiff Katz as representative of the Fed. R. Civ. P. 23 High-Tier Trainer Class defined herein, and Plaintiff Katz's counsel as Class Counsel;

D.      Designation of Plaintiffs as representatives of the Fed. R. Civ. P. 23 Low-Tier Trainer Class defined herein, and Plaintiffs' counsel as Class Counsel;

E.      Certification of this action as a collective action pursuant to 29 U.S.C. § 216(b) for the purposes of the claims brought on behalf of all proposed FLSA Collective members under the FLSA;

F.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23 for the purposes of the claims brought on behalf of all proposed High-Tier Trainer and Low-Tier Trainer Class members under the NYLL and the NYCRR;

G.      Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

H.      A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, the New York Labor Law, the New York Codes, Rules and Regulations, the Family Medical Leave Act 29, U.S.C. §§ 2601 *et seq*., and the New York City Human Rights Law;

I.      All damages which Plaintiffs and all Collective and Class Plaintiffs have sustained as a result of Defendant's conduct, including: (i) back pay for unpaid overtime, minimum wages, unpaid "spread of hours" pay, and unpaid wages (ii) liquidated damages, (iii) penalties, and (iv) general and special damages for lost compensation and job benefits they would have received but for Defendant's improper practices;

J.      All damages which Plaintiff Katz has individually sustained as a result of Defendant's conduct, including back pay, general and special damages for lost compensation and job benefits he would have received but for Defendant's unlawful discriminatory and retaliatory conduct, front pay, liquidated damages, punitive damages, attorneys' fees, interest, and compensatory damages including for emotional distress humiliation, embarrassment, and anguish;

K.      An award to Plaintiffs and all Collective and Class Plaintiffs of pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action on all unpaid wages from the date such wages were earned and due;

L.      An award to Plaintiffs and all Collective and Class Plaintiffs representing Defendant's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

M.      An award to Plaintiffs and all Collective and Class Plaintiffs for the amount of unpaid wages, including interest thereon, liquidated damages subject to proof, and penalties;

N.      Awarding Plaintiffs and all Collective and Class Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

O.      Pre-judgment and post-judgment interest, as provided by law; and

P.      Granting Plaintiffs and all Collective and Class Plaintiffs other and further relief as this Court finds necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this complaint.

Dated:      January 7, 2022
            Garden City, New York

Respectfully submitted,

/s/ James A. Vagnini
James A. Vagnini, Esq.
jvagnini@vkvlawyers.com
Alexander M. White, Esq.
awhite@vkvlawyers.com
**Valli Kane & Vagnini LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
T: (516) 203-7180
F: (516) 706-0248

D. Maimon Kirschenbaum, Esq.
maimon@jk-llp.com
Denise A. Schulman, Esq.
denise@jk-llp.com
Joseph & Kirschenbaum LLP
32 Broadway, Suite 601
New York, New York 10004
T: (212) 688-5640
F: (212) 981-9587

Jacob Aronauer, Esq.
jaronauer@aronauerlaw.com
225 Broadway, 3rd Floor
New York, New York 10007
T: (212) 323-6980
F: (212) 233-9238
jaronauer@aronauerlaw.com

Mariya Gonor, Esq.
mgonor@beattielaw.com
Kimberley A. Brunner, Esq.
kbrunner@beattielaw.com
Beattie Padovano, LLC
200 Market Street, Suite 401
Montvale, New Jersey 076545
T: (201) 799-9736
F: (201) 573-9736

*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on January 7, 2022, the above and foregoing document was served on

Defendant via ECF.

*/s/ James A. Vagnini*
James A. Vagnini
